The next case today is Jocelyn Welch v. City of Biddeford Police Dep't et al. Appeal number 20-1474 and Susan Johnson v. City of Biddeford Police Dep't et al. Appeal number 20-1481. Attorney Hanley, please introduce yourself for the record and proceed with your argument. Good morning, my name is Christine Hanley and I appear for the appellants Susan Johnson and Jocelyn Welch and I would like to reserve two minutes for rebuttal please. Yes, you may have it. Judge Lynch, your honors, may it please the court. On December 29, 2012, the lives of the plaintiffs were irrevocably changed forever. Sue Johnson was shot and injured and Sue and Jocelyn's teenage children were shot and killed. Ms. Hanley, believe me, we know the horrific facts of the case and we ask you to get directly to the issues. Let me perhaps structure this a little bit. Judge Levy did not have the benefit of our decision in Irish 2 at the time he wrote his decision and it's pretty clear that at least as to one aspect of the Irish test, he imposed a more stringent test than Irish actually calls for. So, one of the pragmatic questions is, is that alone a sufficient basis to send it back and say to the judge, you know, you're the district judge, you should get the first shot at doing this. And balanced against that is the notion that, well, even if he had applied the right standard, he would have reached the same result as to the existence of a due process issue. And then my third structuring is, if under Irish 2 he were to decide that there was arguably a state-created danger here, we'd all agree, I believe, he would then have to face the same risk, right? Yes, Your Honor. Okay. So, now applying the Irish 2 standard, could you focus in on exactly two things? One is, what were the affirmative acts and then what was the enhancement of the risk or exacerbation of the risk? Yes, Your Honor. So, the affirmative act, plaintiffs argue, basically can be found in two parts. But the first is that the response to the home and the approximately 25-minute interaction between Officer Dexter and James Pack, where they have discussions about what's going on, where Pack makes threats, and where Officer Dexter attempts but fails at de-escalating the situation. We would argue that that is, right there, an affirmative act, akin to the much shorter voicemail that was left by the Maine State Police detectives in the Irish case. We also argue, though, that in the face of all the information that he had, because he had responded, because he was reacting and had Mr. Pack's threats being made to his face, the decisions that he made after, the decision not to ask about questions, not to ask about custody, and the decision to send Officer Walter Beek away, and the decision not to arrest Pack, we would also argue that all of those decisions should also be considered affirmative acts for the purposes of the state-created danger doctrine. But we recognize that that portion of the argument was not addressed in Irish. So, with respect to the portion that is directly analogous to Irish, our argument is that the affirmative action... Okay, Ms. Hanley, let me start with the second question I asked you, which is the enhancement of the risk. And I think your best argument goes along these lines. The decision not to take Mr. Pack into custody enhanced the risk. Had he been taken into custody, none of this would have happened in the next four minutes. And, in fact, after, and the officer communicates implicitly, and perhaps explicitly, that Mr. Pack is not going to be taken into custody, he is not going to be arrested. In fact, this officer does not even think direct evidence of death threats qualifies as a criminal defense. Okay? That's the theory. The strong evidence for that theory is after the officer more or less says, okay, you know, I'm going to leave, but I'm going to tell you, you stay away from your neighbors and you stop threatening them. And after that, Mr. Pack makes two statements. One is a reference to a statement he has made earlier, but he enhances it. The statement is, you're going to read about it in the newspapers, but then he says, in the morning. Okay? This is an indication that he intends to take immediate action. And, in fact, he does. In the next four minutes, as soon as the officer leaves, he goes to the neighbor's house with his gun and he kills two people and wounds another. Okay? And the other is the repetition of this statement to the effect that it's going to be a bloody mess. And, at that point, the officer, having enhanced the risk by assuring Mr. Pack that he was not going to be detained, should have known better that, at that point, he needed to do more. That may be your best theory. Not quite articulated to the district court in the terms that I've just put. But then, is the Affirmative Act the telling Pack that this is a civil matter and, therefore, the cops are simply not going to be back out? That the police are taking their hands off all of this? Is that what the Affirmative Act is? Your Honor, I think that's part of it because that is the indication that Pack had that no further action was going to be taken, even though he was making threats to shoot his family. He pointed out temporal threats that he was going to do it immediately. But I think the totality of the discussion can be considered the Affirmative Act because the officer identified who the complaining witnesses were, his efforts to de-escalate Pack. If you listen to the tape, you can see Pack's demeanor only gets worse and worse and more heightened than Mr. Pack was when the officers arrived and more heightened than the plaintiffs had ever described him in the past. So, it's the entire interaction. You know, you can't, sorry, but I'm not sure we would, as you say, so Irish didn't directly resolve this question, but the notion that the federal courts are going to say a 25-minute interchange that goes back and forth and back and forth and the officer apparently thinks that there's no risk is itself an act. Then I would say it's the final. And I'm not sure your argument depends on that. I'm not sure it does either. Four minutes remaining. I think the court can look at the final portion of the conversation where Pack makes the direct threat, says they're going to happen in the morning, and the officer says, well, it's a civil situation and I'm not going to act. Let me ask about that. I thought there were two things going on. There was a dispute about property rights, rental rights, parking. That was the underlying dispute. And then there was the threats and harassment. And I read the officer saying that the former was a civil issue, but, quote, I can do things about the harassment, et cetera, and the threatening. And he advised Pack that he can't harass you, he can't threaten you. So I don't see where the officer said that threatening to shoot someone if it causes an apprehension of fear is a civil matter only. No, Your Honor, but he told Pack. So, yes, the original call was because Pack was making harassing statements about the parking. I believe that the officer's comments about the parking being a civil issue only were his efforts to explain to Mr. Pack why the officer wasn't going to do anything with respect to the plaintiffs. He wasn't going to make the plaintiffs do anything. But then in the course of speaking with Pack, Pack makes the threats, he admits to having made the threats and then repeats the threats to the officer and gets increasingly more agitated. The officer doesn't say that those are civil in nature only, but he did testify in his deposition that he didn't believe he had any reason to arrest for those threats, even though they were made in his presence and were made explicitly of an immediate nature. And that was because he had asked one of the victims if he felt threatened, who told him he did not. That's correct, Your Honor, but that question happened prior to this escalation of Pack's threats. That question was asked of Derek at the very beginning of the police response, not after the 25 minutes, and not with the benefit of the plaintiffs having any information about these enhanced threats. You made another argument that the record is actually a lot more ambiguous. The officer says, okay, at any time did you actually feel threatened? Not that, well, not really. I mean, Officer Dexter, okay, Thompson, but Officer Dexter obviously more harassed, yes. And you say a jury could find that that was not, that was a lot more ambiguous with the essentially, as he told everybody, you've got a civil dispute. You need to deal with it in those terms. That's correct, Your Honor. I think that conversation shows that the investigation was directed in that nature. And the rest of the plaintiffs were never asked if they felt threatened by him, and they were not asked after with any benefit of the enhanced threats that Pack had made after that question. So that question was made at the beginning of the police call, and then there's 25 minutes in which Pack is getting increasingly escalated and making direct threats to the officer, which are never communicated to the plaintiffs. And they're never asked if that changes their assessment or makes them feel threatened. So if the officer had never spoken to Pack, he just arrived at the scene, heard what was going on, and left, would you have a claim under IHRA? I think that's a closer call, Your Honor, because that's getting closer to the Deshaney principle that the officers are not responsible for third-party actions when they're not involved. So then what did the officer, by staying there, and as you say, trying to de-escalate the situation and separate the people and talk to Pack, what did the officer do that both increased the risk as compared to doing nothing, and shocked the conscience, as opposed to didn't work or even was negligent? So I'll start with the increasing the risk part. Instead of de-escalating, I think that it's clear that the situation that Pack's seen actually escalated, and then the officer failed to inform the plaintiffs of the direct threats. Time has expired. Go ahead. Answer, please. Go ahead. Is there an affirmative act that the officer did that both increased the risk and shocked the conscience? So I think the affirmative act, it can go back to Judge Lynch's description that he's hearing these threats, and then he's essentially giving Pack the impression that none of these And then in terms of, if I may, with respect to your question about the shock to the conscience, I think the correct standard is the deliberate indifference standard, because until the officer decided he wanted to leave, he had as much time as he wanted to sort out this situation. And when the deliberate indifference only requires that he knew of a risk and disregarded it. And this court in the Irish case said that skepticism of someone's report that something's going to happen does not insulate the officer from at least treating the threat as a possible outcome. Okay. Judge Chaota, do you have any further questions now? No. No.  I don't. Okay. Thank you, Your Honor. You have your time reserved. Attorney Podolsky, thank you. You can introduce yourself on the record to begin. Good morning, Your Honors. Joseph Podolsky for Edward Dexter, Jacob Walter Beek, Chief Roger Bupre, and the City of Biddeford. And Your Honor, I will say at the outset that I've taken note of the specific questions that you've directed towards my sister, and I'll be addressing all of those questions in my argument. I'd also like to say that in preparing for this argument, I've been thinking about the tragedy of the events that have unfolded and the people that are involved. And a colleague of mine handled the lower court proceedings, and I haven't had the opportunity to express my sympathies with the obvious full understanding of the duties that I have towards my clients, and I'd like to do that. I also want to get straight into it, because I think when I think about the people involved, I think specifically also from a duty perspective, as a human perspective as well, of Officer their state of mind in December 2012. I think that that framing goes to the merits of the state-created danger elements, particularly elements 1 and 4. Counselor, let me ask you something about that. Yes. This is purely procedural. I don't mean this as an attack, but did the record below include the audio tape of this Yes, I believe it did. Well, our record doesn't contain that. Why was that not submitted to the court? Because I think that audio tape could really shed a lot of light on the perhaps culpable mental state of the players involved here, and we're reading this on a cold page, which to me makes a lot of difference in qualifying immunity summary judgment analysis. It's my understanding that Appellant's Counsel did include that in the appendix. I can't talk about that. I appreciate knowing that, and I'll try to avail myself of it. I apologize, Your Honor. I was under the impression that when we were compiling the appendix that that was one of the specific inclusions, and Ms. Hanley and I, I recall having a conversation about how to get that over to the court. So my understanding was that that is included in the appendix before the court and was included in the local court's records. Before you go too far down this state of mind track, obviously it goes to qualified immunity to the test of no reasonable officer could have thought X, Y, or Z, but we don't have a qualified immunity ruling in front of us. We have a there is no cause of action ruling in front of us. And as to that, it is true the officer had time to deliberate, and therefore it's a deliberate indifference standard, and we'll have to listen to the audio tape as to that. But let's assume that arguably deliberate indifference can be shown in light of the escalating threats and in light of the you'll read about this in the newspaper in the morning right after the officer has basically said I'm going to leave. Okay, so go back to the two issues we've been talking with plaintiff's counsel about. Enhancement of the risk. Is there any possible jury issue there and affirmative act? Thank you. I will assume it for the analysis, but I certainly do not concede that. You're not conceding. You have limited time on oral argument. Understood. So I think the state of mind framing that I make goes to the merits, particularly the enhancement issue, but also to the qualified immunity argument. Don't argue qualified immunity to us. That is not in front of us. The substantive question is. Right, right. Your Honor. But I would like I would like to argue it only for the sense that this court can affirm the judgment of the lower court on alternate grounds and where qualified immunity was raised in the lower gosh. Yes, you can make that argument. We're well aware of it. There are some reasons to do to follow that course. There are other reasons not to. But why are you avoiding the merits? Well, I'm not, Your Honor. I just want to make sure that it's clear. Then get to it. The one thing that's clear, Officer Dexter, Officer Walter Beek did not create the danger in this case. Let's drop Walter Beek out of it. He'd already disappeared. Officer Dexter, look at his actions. Right. And so Officer Dexter didn't create the danger either. The reason for the 911 call in the first instance was that the plaintiffs in the case, Mr. because of a specific issue with Mr. Pack that involved a landlord tenant issue and that involved perceived threats. So the plaintiff's theory is the difference between this and no call being made whatsoever is that the fact of the call led the police to come. But the police intervention made things worse. He was angry that the police had shown up and they did nothing but exacerbate the situation. Maybe it looked to them like they weren't. And they say, OK, we're going away. And after that, he continues, you'll read about this in the paper in the morning. And four minutes later, he delivers on that. That's, I'm trying to focus you on what is concerning me at least. So the Mr. Pack, before the officers were called, the allegations were that he was saying the same shooting threats that he was. And every other time his wife had come and apologized and had gotten him to calm down. And this time she did not. And her opening words to the officer is he's really angry. I'm talking about this specific time, though. He's making the gesture of a gun with his hands. He's pointing at Mr. Thompson. The threats that were made and repeated are the same before and after the officer arrived. And then in the conversation that your honor is asking about, it wasn't it didn't end with that statement. That's correct. You're quite correct. So the conversation was accurately described by the lower court as a conversation that involved Mr. Pack vacillating. And so he was calm at one point. He was aggravated at another point. And to frame it, if you will, for analysis sake, he was initially not calm. There were further threatening statements made. Officer Dexter said the landlord tenant issue is a civil issue. You cannot make threats. I can act on threats. And he calmed down and his Mr. Pack's wife calmed him down. After continued discussion, he vacillated back up. And that's when he made the newspaper threat, saying specifically that he had nothing to lose. And Officer Dexter didn't just it's not the case. He just walked out of the situation. There are two different references to the newspaper. One is earlier. And as I understand the record, you can tell me if I'm wrong. The officer says, don't want to read about it in the newspaper. Don't want to read about you in the newspaper. Calm down. You know, this is essentially a dispute that can get worked out in the civil courts and indicates he's ready to leave. However, after that, the statement is made again. You're going to read about it in the newspaper in the morning and it's going to be a bloody mess. It is then true that the officer says again, you know, you stay away from those people. Don't threaten them. It's true it doesn't end with the you'll read about it in the morning in the newspapers. And I want to respond to that. I'm concerned about my time, Your Honor. He he he does. It's not like he walks out. He spends a significant amount of time speaking with Mr. Park and again, calming him down. And the last words that Mr. Park said to Officer Dexter were you do not have to worry. And then you have to look at the totality of the circumstance. I'm sorry. It's what he said to Mr. Pack. That's important. He said he can act on the threats if he needs to. And Mr. Pax and he said, you can't make threats. You need to calm down. His wife calmed him down again. And then Mr. Pack says to him, you do not have to worry. He then goes back to the house. And this is where you have to look at the totality of the circumstances. This is what the officer knew December 2012. Verbal altercations like this occurred previously. None ended in violence. Derek Thompson and Miss Johnson both reported that this happens all the time. And usually at the end, Amit Pack comes and apologizes. Mr. Pack is 74 years old. He has no history of violence. No criminal record. Mr. Thompson reports that and whether or not this is ambiguous, I don't think it matters for the sake of analysis of the case. Mr. Thompson does report, though, that he doesn't feel threatened, that he feels harassed. This is not ambiguous. There were no specific requests for protection made to Officer Dexter. It's not a domestic violence situation like Irish, which I won't get into because I know the court is well aware of the facts. But that involved a mandatory arrest scenario and a mandatory protection scenario. This does not. There was no protection request made. And then unlike all of the other preexisting state-created danger cases in this circuit, in the other circuits, the two cases cited by this court specifically in telling the litigants in the Irish case that state-created danger was coming down the pike, all of those cases say part of the evaluation was the officers are falsely reporting a sense of security. Happened in Irish. Happened in the 9th Circuit case and the 11th Circuit case cited by the court. Dexter doesn't do that. He goes back. He has a conversation with Ms. Thompson, sorry, Mr. Thompson and Ms. Johnson and says specifically, he's still a little heated. I would keep your distance. If he's outside, don't go outside. He can't harass you. All of the things reporting accurately the conversation that he had with Mr. Pack. And so none of this case is analogous to any prior state-created danger case. And one of the things I want to address, Your Honor, is the more stringent test question that you posed to my sister. I don't see the lower court's decision as imposing a more stringent test. The district court throughout said greatly enhanced the risk. That is not the Irish standard. And furthermore, it did not at all consider the deliberate indifference point. So maybe it makes no difference. But to tell us that he used the correct standard when he could not have anticipated what the correct standard was and is at variance with what we said in Irish 2. So may I, Your Honor? The Irish derives from Rivera. Rivera. We stated in Irish the criteria. Do you see those criteria as saying the plaintiff has to show that the risk was greatly enhanced? Oh, he doesn't use the word. The Irish 2 doesn't use the word greatly. That's correct. It does not. And yet this district judge imposed that as the standard. So that's where I disagree, Your Honor, because the word greatly does appear. I'm not suggesting. That's throughout the transcript and especially as the standard to be met by the plaintiffs. Mr. Petlosky, I wouldn't argue that standard point with the court anymore. Let me ask this question. Try it this way. Couldn't a jury view these facts, even the ones we know, as a situation where the officers emboldened Pack, sort of expressed sympathy for his position, told him there was nothing he could do about it, and listened to Pack say, well, I'm going to take it into my own hands basically, and even sort of suggested that maybe Thompson was in the wrong? Couldn't someone listening to these facts view it as a situation where the officer enhanced the danger by turning up the heat instead of de-escalating and then leaving? After hearing him say, clearly make threatening statements. Why isn't that a perfectly appropriate way of viewing what happened here as an enhancement? So, Your Honor, there's no evidence to show any sort of Okun factors, if you will. Officer Dexter didn't condone Mr. Pack threatening at all. In fact, he did quite the opposite. The record shows that he said specifically to him on many occasions, you cannot do that. That's not the Irish test. The other thing, too, is every single time an officer reports to a landlord tenant dispute where the officer in that officer's discretion doesn't believe there's an arrestable offense, they're going to tell the people involved, this is a civil matter, every single time. And so if that's the threshold, then every single time an officer reports to a landlord tenant dispute, they're on the borderline of a state-created danger. When there's videotaped evidence of death threats to two people, both an implicit one with the hand gestures and explicit ones, this is not your average landlord-tenant situation. But every landlord-tenant dispute that arises to the point of police intervention generally involves a hotly disputed issue between the parties and the risk of violence. That's what I mean by that. And the end of this call wasn't the newspaper, you will see me in the newspaper tomorrow. The end of this call was Mr. Pack saying, you have nothing to worry about calming down as what was previously reported to Officer Dexter happened on previous calls. Again, he says, you'll read about me in the paper in the morning. It's going to be a bloody mess. And then I think the next sentence is, I'm not going to threaten them anymore. And then he turns around and within four minutes, he has traveled over and done exactly what he said two sentences before. I don't know why a jury couldn't think that he had not, in fact, calmed down. At this point, the officer should have been more alert to the signals. That, Your Honor, to me, in a way that requires an affirmative duty to arrest, which does not exist. It's true. It does not. The question is whether these facts take it out of the duty to arrest situation. You're quite right. The Supreme Court's been abundantly clear. There's no duty to arrest. I'm out of time, Your Honor, unless Your Honor's have any further questions. I thank you and I'll sign off and rest of my briefs. OK, thank you. Attorney Podolsky, please mute your audio and video at this time. Attorney Hanley, if you could unmute your device. Thank you, Your Honor. In summation, I would just like to close with for the reasons that Judge Lynch just articulated. Our argument does not widen the state created danger analysis to every landlord tenant dispute. There were direct threats of specific harm with a specific immediacy made to an officer. In this situation, made by a person whose demeanor was rapidly escalating towards the plaintiffs. So we would submit that the state created danger factors. Firstly, we would argue that they were met. But we acknowledge that the district court did not have the benefit of the specific four-point test outlined in Irish. And we would argue that the requirement that they greatly enhance the danger is not required. It's just whether they enhance the danger. And under this fact pattern, we believe the plaintiffs have shown that Officer Dexter enhanced the danger to the plaintiffs. And that is not too broad a reading to allow the exception to swallow the rule, so to speak. Judge Kayada, your mic is off. I thought the evidence was agreed to by both sides that at the end of the conversation, Pack was no more or no less agitated than he had been at the beginning. I don't believe the plaintiffs agreed to that, Your Honor. I believe the defendants described him as having a fluctuating demeanor. But the plaintiff's listening of the tape and view is that he remained agitated at the end. And he was certainly more agitated than he had been in their interactions out in the parking lot before the officers arrived. When he pointed his finger at them? Yes. And so at the end of the day, what was the officer to have done other than do a more skillful interrogation? Are you saying he should have arrested Pack? Any number. I mean, we could start with the investigation. He could have asked him whether he had access to firearms. He could have asked him whether he had had anything to drink. And that could have yielded an entirely different response if he said, yeah, I do have firearms and he's threatening to shoot someone. I think the officer could have remained on the scene. He could have taken him under protective custody as he was allowed under policy or he could have arrested him. He also could have provided all the information to the plaintiffs that there were these enhanced threats that had been made against their lives by their landlord who was, you know, 100 feet away from them. But he didn't do that either. Time has expired. The court has no more questions. I thank you for your time. I see none. Thank you. That concludes argument in this case. Attorney Hanley and Attorney Podolsky, you can disconnect from the hearing at this time.